# Illinois Official Reports

## Appellate Court

---

**People v. Cleary, 2013 IL App (3d) 110610**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL K. CLEARY, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0610 |
| Filed | November 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for murdering his wife, the appellate court rejected defendant's contention that his rights under the confrontation clause were violated by the admission of the statements his wife made to family members and friends prior to her death that defendant was going to kill her if she left him, since the statements were not testimonial under the test set forth in *Stechly,* that is, they were not made in a "solemn fashion," and they were not intended to establish a particular fact. |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 10-CF-205; the Hon. Stuart P. Borden, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on | Peter A. Carusona and Santiago A. Durango (argued), both of State |

Appeal                       Appellate Defender's Office, of Ottawa, for appellant.

Stewart Umholtz, State's Attorney, of Pekin (Terry A. Mertel and Judith Z. Kelly (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel                        JUSTICE McDADE delivered the judgment of the court, with opinion.
Presiding Justice Wright concurred in the judgment and opinion.
Justice Schmidt specially concurred, with opinion.

**OPINION**

¶ 1      Following a jury trial, defendant Daniel Cleary was convicted of murdering his wife and sentenced to 60 years' imprisonment. During the trial, the State admitted hearsay statements made by the victim pursuant to section 115-10.2a of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.2a (West 2010)). In these statements, the victim told her friends and family that defendant had stated he would kill her if she tried to end their marriage and that she wanted to leave defendant but was afraid to do so. On appeal, defendant contends that pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004), admitting these statements violated his rights under the confrontation clause of the sixth amendment to the United States Constitution. He argues that section 115-10.2a was unconstitutional as applied to him because it allowed testimonial hearsay statements to be admitted against him when he had no prior opportunity to cross-examine the declarant.

¶ 2      This case calls for us to determine whether the statements admitted against defendant were testimonial. Applying the test set out in *People v. Stechly*, 225 Ill. 2d 246 (2007) (plurality op.), we conclude that the hearsay statements at issue were not testimonial. Accordingly, the confrontation clause does not bar their admission against defendant, and we affirm.

¶ 3                            FACTS

¶ 4      MeLisa Cleary and her husband Daniel Cleary lived together with their children, Jacob and Chloe, and Kaitlyn, MeLisa's daughter from a previous marriage. In May 2008, MeLisa had decided to end her relationship with Cleary and started spending the weekends with her friend Nicole Simpson; MeLisa and Simpson frequented the "Tops & Tails" bar in Creve Coeur, where MeLisa started a relationship with one of the bar's regular patrons. At the end of May

2008, MeLisa told Cleary she wanted a divorce, and she planned to move out of the marital residence on June 6, 2008.

¶ 5     MeLisa and Cleary had an argument in their home on the evening of June 6, 2008. Later that evening, MeLisa did not show up to her sister's house as planned, and calls to MeLisa's cell phone went unanswered. The following day, MeLisa's Ford Expedition was found abandoned about a half-mile from Cleary's home in Mackinaw, Illinois. On June 9, 2008, MeLisa was found dead under an interstate overpass in Logan County. On April 16, 2010, the State charged Cleary with five counts of first degree murder (720 ILCS 5/9-1(a) (West 2010)), alleging that Cleary caused MeLisa's death by striking her on the head.

¶ 6                                    I. Statements Made by MeLisa

¶ 7     Prior to trial, the State requested to admit hearsay statements made by MeLisa to her friends and family members pursuant to section 115-10.2a of the Code of Criminal Procedure (725 ILCS 5/115-10.2a (West 2010)). The substance of those statements, and the conversations in which they occurred, is as follows.

¶ 8     Kaitlyn, MeLisa's 12-year-old daughter, testified that one or two days prior to her death, MeLisa asked Kaitlyn what she thought about MeLisa and Cleary getting a divorce. Kaitlyn answered that she thought it would be a good idea. MeLisa then asked Kaitlyn to watch over Jacob and Chloe because MeLisa thought "something bad was going to happen to her."

¶ 9     Paul Robertson met MeLisa approximately one month before her death at the Tops & Tails bar. In a conversation at the bar approximately two weeks before her death, MeLisa told Robertson that her marriage was "rocky" and that Cleary had threatened to kill her if she left him. MeLisa also said that when she told Cleary she wanted a divorce, he showed no emotion, which scared MeLisa.

¶ 10    MeLisa and her sister Brandy Gerard discussed MeLisa's marriage at MeLisa's home in Mackinaw on May 10, 2008. MeLisa told Brandy that she wanted to leave her marriage with Cleary but would never make it out alive, saying that Cleary had told her he would kill her and burn the house down. When Brandy urged her to gather her belongings and leave, MeLisa said that it did not matter if she ran–Cleary would find her and kill her. MeLisa also told Brandy that while Cleary was supposed to be in California that weekend, she believed Cleary was still in town, following her.

¶ 11    Stephanie Sanford was a friend of MeLisa's from the Tops & Tails bar, where they met one month prior to MeLisa's death. Sanford testified that a couple weeks before MeLisa's death, when she called MeLisa's home a man answered and told her never to call again. MeLisa called Sanford back and apologized, saying that Cleary was acting crazy and they were getting a divorce. MeLisa also said that Cleary had "hurt her before" but did not say how or when. During a conversation on the night prior to MeLisa's death, MeLisa told Sanford that Cleary said that if MeLisa "tried to leave him again, that he would kill her, that if he couldn't have her, nobody could."

¶ 12    Nicole Simpson was a friend and former coworker of MeLisa. While discussing MeLisa's marriage, Simpson asked why MeLisa stayed with Cleary if she was so unhappy in the

relationship. MeLisa responded that Cleary, on multiple occasions, said he would never let her out of the marriage and that he would kill her first. While Simpson urged MeLisa to contact the police about these threats, she refused to do so. MeLisa called Simpson on the phone the day prior to her death, and Simpson could tell that MeLisa was upset. MeLisa told Simpson that she woke up in the middle of the night and Cleary was pacing in front of the bed, staring at her. Cleary told MeLisa he was watching her sleep because she was so beautiful and that he would never let her out of the marriage and would kill her first.

¶ 13    The trial court ruled these statements satisfied the criteria of section 115-10.2a and were admissible. The court did not rule whether the statements violated Cleary's confrontation clause rights because that issue was not argued at the pretrial hearing.

¶ 14    During the trial, as part of its case-in-chief, the State elicited testimony from the above witnesses in which they relayed the statements made by MeLisa.

¶ 15                                    II. Other Evidence at Trial

¶ 16    The other evidence presented at trial established that the following events occurred. On the afternoon of June 6, 2008, Cleary came home early from work, and MeLisa made repeated calls to Simpson expressing her alarm about his early arrival. She planned on packing her bags and going to Simpson's home that evening. Around 5 p.m., MeLisa was on the phone with Sanford, and Sanford heard a man's voice yelling in the background, after which the call ended abruptly.

¶ 17    Jacob, the couple's son, was home on June 6, and he testified that Cleary yelled at MeLisa to get off the couch. Cleary then told Jacob and his sister Chloe to go to their room and turn the radio up loud. Jacob stated that his father usually told him to do this when his parents would argue. Jacob testified that he and Chloe were in his room for close to an hour.

¶ 18    Kaitlyn, MeLisa's daughter, testified that Cleary and MeLisa had been arguing intensely for the past several weeks. When she returned home at around 5:30 p.m. on June 6, Kaitlyn saw Cleary emerge from the garage looking agitated: his face and neck were bright red, as if he had been arguing with MeLisa. Cleary began pacing in the kitchen, then ordered Kaitlyn, Jacob, and Chloe to go outside, since Cleary stated he was going to spray for bugs. Jacob testified that they were outside for what seemed like a long time.

¶ 19    After the children came back inside, Cleary told Kaitlyn not to go into the garage; however, while Cleary showered, Kaitlyn went into the garage to retrieve her purse from MeLisa's Ford Expedition. Kaitlyn testified she saw red spots on the floor of the garage. When she looked inside the vehicle, in the cargo area she saw a shape wrapped in blankets. Kaitlyn thought the shape looked like a body lying on its side. She also noticed more red spots in the back of the vehicle. Kaitlyn testified she grabbed her purse and left the garage quickly because she was disobeying Cleary's order not to go in the garage.

¶ 20    Kaitlyn did not tell investigators about the shape she saw in the vehicle for more than a month after MeLisa was found dead. Kaitlyn testified that she did not tell the police what she had seen in the garage because she did not want Cleary to find out she had told them. Kaitlyn initially said that the reason she did not tell the police immediately was that Cleary had

threatened her, saying that if she said anything, he would kill her dog while making her watch and then he would beat her to death. Kaitlyn admitted that Cleary did not actually threaten her, and she told this story at the urging of MeLisa's sister Felicia.

¶ 21   On the evening of June 6, both Kaitlyn and Jacob tried to enter MeLisa's bedroom to say goodnight, but Cleary stopped them and said their mother did not want to be disturbed. Cleary subsequently drove Kaitlyn to a sleepover, taking Jacob and Chloe with him on a job and then going out for ice cream. Kaitlyn tried to call MeLisa's cell phone that night, but her calls went unanswered.

¶ 22   When MeLisa did not show up to Simpson's house that evening as planned, Simpson called and sent text messages to MeLisa, with no response. She contacted Cleary looking for MeLisa, and he gave inconsistent statements as to where he had last seen her.

¶ 23   On Saturday, June 7, Tazewell County sheriff deputies went to Cleary's home to conduct a preliminary investigation of a missing person. They spoke to Cleary and walked through the home. They noticed that the bed in the master bedroom was stripped of the bedding and found damp pairs of sneakers and damp bedspreads in the clothes dryer, along with a bottle of bleach. The officer also observed Cleary scrubbing the floor of the garage with a rag and bottle of cleaner; Cleary stated he had spilled some oil on the floor while changing the Expedition's oil. Later that day MeLisa's mother went to the home and also found Cleary scrubbing the floor of the garage, although she did not notice a spill. Jacob also testified that earlier that morning he saw his father scrubbing the garage floor with bleach and doing laundry.

¶ 24   On the afternoon of June 7, MeLisa's abandoned Expedition was found approximately a half-mile south of the Cleary residence. A farm field separated the road where the vehicle was found from the Cleary's home. A path led through the field's grass toward Cleary's home, but the path disappeared in a muddy part of the field. Jacob testified that he saw muddy footprints inside the home on the morning of June 7.

¶ 25   After MeLisa's body was discovered on June 9, police forensically examined the Expedition and Cleary's garage. In the Expedition, investigators found possible traces of blood in the cargo area and on the driver's pedals. In the garage, investigators found possible spots of blood, and a spot from the garage door matched MeLisa's DNA profile. One part of the garage door had a streak pattern, indicating that blood had been partially wiped clean. Traces of blood were not found on any tools or the walls and ceiling of the garage.

¶ 26   The coroner examined MeLisa's body and concluded that MeLisa's death was caused by blunt trauma to the head and neck. The coroner also determined that MeLisa had not died where she was found, but was killed the night of Friday June 6, then laid on her back for 8 to 12 hours, causing the blood to congeal in her wounds. Investigators found no indication of a sexual assault.

¶ 27   After the State rested, Cleary presented evidence that a neighbor spotted two unidentified men in a vehicle parked next to the Expedition in the early morning of June 7. He also argued that MeLisa was engaging in high-risk behavior: he presented evidence that MeLisa had started a sexual relationship with a man she met at the Tops & Tails bar, and had contacted another man on MySpace about meeting with him. Cleary also elicited testimony that another

bar patron followed MeLisa around the bar and made unwelcome comments to her, which made MeLisa feel "creeped out." A defense expert also testified that nothing ruled out the possibility that the sample of Melisa's DNA found in the garage came from her merely rubbing against the garage door.

¶ 28 After the close of evidence and arguments, the jury returned a guilty verdict. Cleary's posttrial motion for a new trial was denied, and the court sentenced Cleary to 60 years' imprisonment. Cleary appeals.

¶ 29                                                       ANALYSIS

¶ 30 In this case, pursuant to section 115-10.2a, the court admitted various hearsay statements made by MeLisa which conveyed Cleary's threats to kill her if she ended their relationship. This statute allows hearsay statements made by a person protected under the Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2010)) to be admitted in a "domestic violence prosecution," if the statements are not covered by any other hearsay exception but have equivalent circumstantial guarantees of trustworthiness, and the person who made the statements is unavailable to testify. 725 ILCS 5/115-10.2a(a) (West 2010). In addition, to admit the statements the court must find (1) the statements are evidence of a material fact; (2) the statements are more probative than any other evidence which the proponent can reasonably procure; and (3) that admitting the statements will best serve the general purposes of the statute and the interests of justice. See 725 ILCS 5/115-10.2a(a) (West 2010).

¶ 31 One previous appellate court decision allowed hearsay statements of a murdered spouse to be admitted under this section (see *People v. Richter*, 2012 IL App (4th) 101025, ¶¶ 90-93), and Cleary concedes on appeal that the statute permitted the admission of the statements made by MeLisa. Instead, he contends that the statute is unconstitutional as applied because it allowed testimonial hearsay statements to be admitted against him, which violated his rights under the confrontation clause of the sixth amendment under *Crawford v. Washington*, 541 U.S. 36 (2004).

¶ 32 Accordingly, this case calls on us to determine whether the admission of Melisa's hearsay statements pursuant to section 115-10.2a violated Cleary's right to confront the witnesses against him. Whether a defendant's constitutional right has been violated is reviewed *de novo*. *People v. Burns*, 209 Ill. 2d 551, 560 (2004).

¶ 33                                                     I. Forfeiture

¶ 34 As an initial matter, the State notes that Cleary did not raise the issue of whether the statements are barred by the confrontation clause either at trial or in a posttrial motion, and it argues that Cleary has forfeited the issue by failing to raise it below. While Cleary apparently did raise the confrontation clause issue prior to trial, he failed to pursue the argument. Before ruling that the statements were admissible pursuant to section 115-10.2a, the trial judge stated that "I'm not going to get into whether it runs with *Crawford* or whether it's constitutional at this point in time, [because it] hasn't really been brought to the Court's attention in that fashion." Cleary also failed to file a posttrial motion alleging a constitutional violation.

¶ 35        Despite his failure to pursue the argument at trial, Cleary is challenging that the statute was unconstitutional as applied, and generally, a challenge to the constitutionality of a statute may be raised at any time. *People v. McCarty*, 223 Ill. 2d 109, 123 (2006). See also *People v. Emmett*, 264 Ill. App. 3d 296, 297 (1994) (argument that statute is unconstitutional as applied may be raised on appeal even if the issue was not raised in trial court). Accordingly, we conclude that Cleary has not forfeited appellate review of this issue, and turn to the merits of his argument.

¶ 36                            II. Confrontation Clause

¶ 37        Under the sixth amendment, a criminal defendant has the right to be confronted with the witnesses against him. U.S. Const., amend. VI. In *Crawford v. Washington*, the Supreme Court held the confrontation clause prevents a "testimonial" hearsay statement of a declarant from being admitted against a criminal defendant, unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68. Nontestimonial hearsay statements, however, are not subject to the protection of the confrontation clause, although they may still be excluded under normal hearsay rules. See *Davis v. Washington*, 547 U.S. 813, 821 (2006). Accordingly, whether the hearsay statement is testimonial is often the threshold issue under confrontation clause analysis. See *People v. Stechly*, 225 Ill. 2d 246, 279 (2007).

¶ 38        In this case, the parties dispute whether the statements made by MeLisa, the murder victim, qualify as testimonial. To resolve this issue, we must examine relevant case law from both the United States Supreme Court and the Illinois Supreme Court.

¶ 39           A. Testimonial Statements Under United States Supreme Court Precedent

¶ 40        While only testimonial hearsay is subject to scrutiny under the confrontation clause, the Supreme Court has declined to give a comprehensive definition of "testimonial." *Crawford*, 541 U.S. at 68. However, in *Crawford* the Court looked to the definitions of witness and testimony to determine what concerns are implicated by the confrontation clause, stating that the text of the confrontation clause:

> "[A]pplies to 'witnesses' against the accused–in other words, those who 'bear testimony.' 2 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement." *Crawford*, 541 U.S. at 51.

¶ 41        The Court articulated three formulations of a "core class" of testimonial statements subject to scrutiny under the confrontation clause, describing those formulations as follows: (1) "*ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or

similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; or (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." (Internal quotation marks omitted.) *Crawford*, 541 U.S. at 51-52.

¶ 42 The Court did not adopt any of these three formulations, but concluded that whatever the formulation, testimonial statements "applie[d] at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," because "these are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford*, 541 U.S. at 68. In *Crawford*, the Court held that a recording of a police interrogation of the defendant's wife was testimonial hearsay and could not be admitted against him. *Crawford*, 541 U.S. at 68.

¶ 43 In subsequent cases, the Court has determined whether a statement is testimonial by looking to the "primary purpose" of the statement. *Davis*, 547 U.S. at 822. The *Davis* Court determined that statements made to police are testimonial when the objective circumstances indicate "that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. See also *Michigan v. Bryant*, 562 U.S. ___, 131 S. Ct. 1143, 1155 (2011) (a statement to police is testimonial if it is "procured with a primary purpose of creating an out-of-court substitute for trial testimony"). However, if a statement is made to enable police to meet an ongoing emergency, the statement is not testimonial because the primary purpose of the statement is not to prove some past fact for later use at trial. See *Davis*, 547 U.S. at 827-28 (holding that statements made to 911 operator were made to assist in ongoing emergency and thus were not testimonial); *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1166-67 (holding that shooting victim's statement to police at scene of crime identifying who shot him was not testimonial because the primary purpose of the statement was to meet an ongoing emergency). The Court stated that the primary purpose of the statement is context-dependent, and should be determined by examining the objective circumstances surrounding the statement as evidenced by the actions of both the declarant and the interrogator. *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1160-61. "That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1156.

¶ 44 In another set of cases, the Court determined that formal documents, created for evidentiary purposes and to aid in police investigations, qualify as testimonial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) (a sworn, certified lab report stating that substance was cocaine was testimonial); *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011) (lab report showing defendant's blood alcohol content containing signed certificate from analyst was testimonial). See also *Williams v. Illinois*, 567 U.S. ___, ___, 132 S. Ct. 2221, 2243 (2012) (plurality op.) (holding that DNA profile report is not testimonial because it was not prepared with primary purpose of targeting an accused individual or creating evidence for

use at a later trial).

B. Testimonial Statements Under Illinois Precedents

¶ 45                  B. Testimonial Statements Under Illinois Precedents

¶ 46      In the 2007 case of *People v. Stechly*, our supreme court faced the issue of whether admitting a child's hearsay statements implicating the defendant in a sexual assault, without an opportunity to cross-examine the child, constituted a violation of the defendant's confrontation clause rights under *Crawford*. *Stechly*, 225 Ill. 2d at 262. A plurality of the court, interpreting *Crawford* and *Davis*, determined that a testimonial statement had two components. *Stechly*, 225 Ill. 2d at 281.

¶ 47      First, a testimonial statement must be made in a "solemn fashion." *Stechly*, 225 Ill. 2d at 281. Indicia of solemnity could include whether the statement was made formally–such as under oath or after *Miranda* warnings had been given–or whether there were severe consequences that could discourage dishonesty, such as the threat of potential legal consequences for lying to a police officer. *Stechly*, 225 Ill. 2d at 281 (citing *Davis*, 547 U.S. at 826).

¶ 48      Second, a testimonial statement must be intended to establish a particular fact. *Stechly*, 225 Ill. 2d at 282. Here, the court must evaluate whether the primary purpose of the statement is to enable police to meet an ongoing emergency or to establish a fact relevant to later criminal prosecution. *Stechly*, 225 Ill. 2d at 282 (citing *Davis*, 547 U.S. at 822, 830). "[T]he focus is on whether, at the time the statement was made, the witness[, *i.e.*, the declarant] was acting in a manner analogous to a witness at trial, describing or giving information regarding events which had previously occurred." *Stechly*, 225 Ill. 2d at 282. If the statement is the product of law enforcement interrogation, it is the intent of the questioner eliciting the statement that is determinative. *Stechly*, 225 Ill. 2d at 284-85. When the statement is not the product of police interrogation, the court determined that the proper focus is on the intent of the declarant: "Would the objective circumstances have led a reasonable person to conclude that their statement could be used against the defendant?" *Stechly*, 225 Ill. 2d at 289. Regarding this second prong, the court concluded that it was possible for a statement to be testimonial even if not made to law enforcement. *Stechly*, 225 Ill. 2d at 289.

¶ 49      Applying these principles to the facts of *Stechly*, the plurality concluded that a nurse and social worker who recorded the child's hearsay statements implicating the defendant in abuse were not doing so for treatment purposes, but to gather information for law enforcement, and therefore the statements made by the child were testimonial. *Stechly*, 225 Ill. 2d at 300. However, the child's statements to her mother were held not to be testimonial. *Stechly*, 225 Ill. 2d at 301. The court noted that the mother's question to the child–asking "what happened" while taking the child to the hospital–was not eliciting information for law enforcement, and therefore it evaluated the statement from the perspective of the declarant. *Stechly*, 225 Ill. 2d at 301-02. The court concluded that when the child told her mother of the abuse, she was merely explaining the reason for the trip to the hospital, and therefore the circumstances did not support the conclusion that an objective declarant in the child's place would anticipate the statement would likely be used in a prosecution. *Stechly*, 225 Ill. 2d at 302. The court also

noted it was debatable whether the child's statement to her mother was made with sufficient solemnity. *Stechly*, 225 Ill. 2d at 302.

¶ 50    The *Stechly* plurality determined that the admission of testimonial statements required reversal and remand for a new trial. *Stechly*, 225 Ill. 2d at 316. Concurring in part, Justice Kilbride agreed that the admission of the testimonial statements made to the nurse and social worker required reversal, but wrote separately to state that the child's statements to her mother were also testimonial. *Stechly*, 225 Ill. 2d at 329 (Kilbride, J., concurring in part and dissenting in part). First, he believed the statement was made with sufficient solemnity, because it was a serious situation and the mother, as an authority figure, could potentially impose discipline on the child. *Stechly*, 225 Ill. 2d at 328 (Kilbride, J., concurring in part and dissenting in part). Second, he believed the objective circumstances indicated a reasonable adult in the child's position would realize the statement would likely be used in a prosecution, because the statement was describing an action that constituted a serious criminal offense. *Stechly*, 225 Ill. 2d at 329 (Kilbride, J., concurring in part and dissenting in part). Justice Kilbride also disagreed with the shifting-intent analysis of the plurality, stating that the sole focus of whether the statement's primary purpose is intended to establish a fact for later prosecution should be on the intent of the declarant. *Stechly*, 225 Ill. 2d at 323-24 (Kilbride, J., concurring in part and dissenting in part). The three other justices dissented, writing in part that the admission of the testimonial hearsay statements was harmless error. See *Stechly*, 225 Ill. 2d at 330-31 (Thomas, C.J., dissenting, joined by Karmeier, J.); *Stechly*, 225 Ill. 2d at 353 (Garman, J., dissenting).

¶ 51    Since *Stechly* was decided, our supreme court has twice used the plurality's two-part framework for determining whether a hearsay statement is testimonial. In *In re Rolandis G.*, the court cited *Stechly* for the proposition that a testimonial statement is one which is (1) made in a solemn fashion, and (2) intended to establish a particular fact. *In re Rolandis G.*, 232 Ill. 2d 13, 31 (2008). The court held that a child's videotaped statements to a licensed child advocate about sexual abuse were testimonial because the advocate was acting as an agent for law enforcement, to gather information about the past abuse to aid in the investigation and future prosecution. *In re Rolandis G.*, 232 Ill. 2d at 32-33.

¶ 52    In *People v. Sutton*, the court again applied the *Stechly* framework for a testimonial statement. *People v. Sutton*, 233 Ill. 2d 89, 111 (2009). There, a robbery and shooting victim described his assailant to police at the crime scene and told police the assailant had run into an alley; the court held that these statements were elicited with the intent of responding to an ongoing emergency, not to establish what had happened in the past, and therefore the statements were not testimonial. *Sutton*, 233 Ill. 2d at 115-16. However, the court concluded that the victim's statements given to a police officer while being driven to the hospital in an ambulance were testimonial. *Sutton*, 233 Ill. 2d at 119-20. The court reasoned that when the officer in the ambulance asked the victim to "tell him 'again' " what happened, the officer intended to establish a record of past events, and therefore the primary purpose of the conversation was to establish a particular fact and not to aid in an ongoing emergency. *Sutton*, 233 Ill. 2d at 119. The court further concluded that the statements were sufficiently solemn because they were the product of a law enforcement interrogation and the statements were "embedded" in the police officer's report. *Sutton*, 233 Ill. 2d at 119-20.

¶ 53    The decisions in *Rolandis G.* and *Sutton* seemed to signal that our supreme court had adopted the *Stechly* plurality's framework for determining whether a statement was testimonial for the purposes of confrontation clause analysis. See *Sutton*, 233 Ill. 2d at 125 (Kilbride, J., specially concurring) ("[A] majority of this court has clearly adopted the *Stechly* plurality's framework for determining whether an out-of-court statement is testimonial. [Citation.] Accordingly, while I disagree with that framework, I agree it is now the applicable test in the absence of further direction from the Supreme Court."). However, in its most recent confrontation clause case, our supreme court did not apply the *Stechly* framework when addressing whether a statement was testimonial. See *People v. Leach*, 2012 IL 111534. Moreover, developments in the law since the case was decided call into question one aspect of the *Stechly* framework. Specifically, in *Bryant*, the Supreme Court established that the primary purpose of the out-of-court statement is determined by analyzing the objective circumstances surrounding the statement based on the actions of both the declarant and the person receiving the statement. *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1156. *Stechly*'s shifting-intent inquiry–where the focus of primary purpose of the statement is on the questioner's intent if the statement is given to law enforcement, but on the declarant's intent if given to nongovernment personnel–may thus be inconsistent with *Bryant*'s direction that both parties to the conversation be considered.

¶ 54    Despite this uncertainty, we will apply the *Stechly* framework to the case at hand to evaluate whether MeLisa's statements were testimonial. We believe that the *Stechly* framework provides a straightforward, rational framework to guide a court's confrontation clause analysis. Moreover, nothing in our supreme court's recent decision in *Leach* can be seen as an abandonment of the *Stechly* framework.

¶ 55                              C. Application to the Case at Bar

¶ 56    Applying *Stechly*, to be testimonial MeLisa's statements must have (1) been made in a solemn fashion, and (2) been intended to establish a particular fact. *Stechly*, 225 Ill. 2d at 281-82; *Sutton*, 233 Ill. 2d at 111. A statement is made in a solemn fashion if it is formal (such as under oath or made to a police officer) or if there is some threat of consequences for dishonesty. See *Stechly*, 225 Ill. 2d at 281-82; *Sutton*, 233 Ill. 2d at 119-20. See also *Stechly*, 225 Ill. 2d at 328 (Kilbride, J., concurring in part and dissenting in part) (child's statement describing sexual abuse to mother was solemn because it was a serious situation and there was a threat of discipline if the child lied to her mother, an authority figure). A statement is intended to establish a particular fact if the declarant is acting in a manner analogous to a witness at trial, giving information about past events that could potentially be relevant to a later criminal prosecution. *Stechly*, 225 Ill. 2d at 282.

¶ 57    Regarding the second prong, Cleary argues a reasonable person would conclude that MeLisa's statements would be used against Cleary if MeLisa was in fact killed. Indeed, Cleary argues that MeLisa intended for the statements to be passed on to the authorities, and that her "statements had little value except to ensure the arrest and eventual prosecution of the defendant." We disagree. Given the context of these conversations, it is not at all clear that a reasonable person in MeLisa's place would have anticipated the statements would have been

- 11 -

used in a future prosecution of Cleary. MeLisa's statements about Cleary's threats to kill her often occurred in conversations where she was discussing her relationship and why she was afraid to leave it; her statements could have been explanations for why she stayed in the relationship, expressions of her feelings of helplessness, or cries for help. It is not axiomatic that a reasonable person would make these statements with the intent that they be transmitted to law enforcement in the event of a subsequent crime occurring, and Cleary has cited no other evidence demonstrating such an intent.

¶ 58    In addition, MeLisa's statements were clearly not made in a solemn fashion. Statements made formally, or where there are severe consequences for dishonesty, are considered to be sufficiently solemn. See *Stechly*, 225 Ill. 2d at 281-82. Here, MeLisa's statements were remarks to her friends–some of whom she had not known long–and family in the course of discussing her relationship. See *Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The statements were not made under oath, nor were they embedded in any sort of signed or formalized document. The statements were not made to law enforcement personnel, and the people to whom MeLisa gave the statements were not otherwise authority figures. Although MeLisa's statements involved a serious topic, they were not made in a formal setting, and there was no apparent threat of consequences if MeLisa was being dishonest.[1] Based on these facts, we conclude MeLisa's statements were not solemn, and therefore her statements were not testimonial. The trial court did not err by admitting the statements against Cleary, and we reject his argument that section 115-10.2a was unconstitutional as applied.

¶ 59                    D. The *Per Se* Rule of *People v. Richter*

¶ 60    In so holding, we note that in its brief, the State has argued that we should adopt the rule established by the Fourth District Appellate Court in *People v. Richter*, 2012 IL App (4th) 101025. *Richter* presented a set of facts similar to those of the present case, in which the defendant was accused of killing the mother of his children, and the State admitted various hearsay statements made by the victim to her family, neighbors, and coworkers. *Richter*, 2012 IL App (4th) 101025, ¶ 7. In these statements, the victim stated that she was trying to move away from defendant and she detailed various threats to kill her made by the defendant and her resulting fear of him. *Richter*, 2012 IL App (4th) 101025, ¶¶ 7-39. On appeal, the court rejected the defendant's argument that admitting the statements against him violated his rights under *Crawford*. *Richter*, 2012 IL App (4th) 101025, ¶ 156. The court adopted a *per se* rule that statements are not testimonial unless there is government involvement in either eliciting or

---

[1]This seems to be an odd result, since if a statement is made under circumstances which encourage honesty, they are testimonial and the confrontation clause bars their admission, while if they are made in circumstances which are not solemn, the confrontation clause does not limit their admissibility. However, the Supreme Court has made clear that the focus of the confrontation clause is not to ensure reliability of evidence. The task of ensuring reliability of nontestimonial hearsay can be done by the normal hearsay rules. See *Crawford*, 541 U.S. at 68.

- 12 -

receiving those statements. *Richter*, 2012 IL App (4th) 101025, ¶ 135.[2] Because none of the victim's statements were made to agents of the state, the court concluded that they were not testimonial. *Richter*, 2012 IL App (4th) 101025, ¶ 156.

¶ 61 To arrive at its conclusion that testimonial hearsay requires government involvement, the *Richter* court conducted an extensive analysis of the law. The *Richter* court relied heavily on Professor Graham, who interprets *Davis* to focus solely on the conduct of government agents, which Professor Graham argues supports the proposition that a statement made to someone who is not a government agent cannot be testimonial. *Richter*, 2012 IL App (4th) 101025, ¶¶ 123-24 (citing Michael H. Graham, Graham's Handbook of Illinois Evidence § 807.1, at 1013 (10th ed. 2010)). Second, *Richter* relied on a passage from the United States Supreme Court's opinion in *Giles v. California*, which implied that statements made to friends and neighbors describing domestic abuse would not qualify as testimonial: " '[O]nly *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules ***.' " (Emphasis in original.) *Richter*, 2012 IL App (4th) 101025, ¶ 126 (quoting *Giles v. California*, 554 U.S. 353, 376 (2008)). Third, the court cited commentary which asserts that without government involvement, the evils the confrontation clause is designed to prevent are not implicated. *Richter*, 2012 IL App (4th) 101025, ¶¶ 133-34. Finally, the court also cited a number of cases from other jurisdictions which concluded that statements between private parties, with no government involvement, were not testimonial. *Richter*, 2012 IL App (4th) 101025, ¶ 138 (listing cases).

¶ 62 The *Richter* court declined to follow the framework for testimonial statements set out in *Stechly*. The court stated that *Stechly* plurality's pronouncement that a statement could be testimonial even if not given to law enforcement was *dicta*, because the nurse and social worker were acting as agents of law enforcement. *Richter*, 2012 IL App (4th) 101025, ¶ 162. Furthermore, the *Richter* court placed importance on the fact that the *Stechly* opinion was decided in 2007, before the United States Supreme Court's 2008 decision in *Giles*. *Richter*, 2012 IL App (4th) 101025, ¶ 165.

¶ 63 While the State has urged us to follow *Richter*, we decline to do so on several grounds. First, a *per se* rule seems contrary to the Supreme Court's case-by-case approach to this issue. See *Stechly*, 225 Ill. 2d at 280 ("[T]he Court's approach has been to steer away from generalized, abstract pronouncements and instead to focus on the particular statements under consideration."). Second, doing so is not necessary to resolve this case, because the statements

---

[2]As an exception to its *per se* rule, *Richter* also adopted what it called the "conduit theory." *Richter*, 2012 IL App (4th) 101025, ¶¶ 141-49. It stated that even if a statement is not made directly to a government agent, if the declarant intends for that statement to be transmitted to law enforcement and is using the nongovernmental recipient as a mere conduit, the statement would be deemed testimonial. *Richter*, 2012 IL App (4th) 101025, ¶ 142. It cited an example where a murder victim gave a letter implicating the defendant to a neighbor, intending for the letter to be given to police if she was harmed, and concluded that the letter would be testimonial under the conduit theory. *Richter*, 2012 IL App (4th) 101025, ¶ 148 (citing *State v. Jensen*, 2007 WI 26, 299 Wis. 2d 267, 727 N.W.2d 518).

at issue here are not testimonial under the formulation in *Stechly*. Finally, at this time we are not convinced that such a *per se* rule is appropriate, for the following three reasons.

¶ 64     First, a *per se* rule requiring government involvement is not compelled by the United States Supreme Court decisions addressing the scope of testimonial statements. While the *Richter* decision relied on the passage from *Giles* quoted above, this statement was pure *dicta*. The issue in *Giles* was whether a defendant could forfeit the protections afforded by the confrontation clause by wrongfully causing a witness to be unavailable at trial; the case did not address whether the hearsay statements at issue were testimonial. See *Giles*, 554 U.S. at 358 (the Court "accept[ed] without deciding" that the statements at issue were testimonial). Moreover, we do not read *Davis* or *Giles* as restricting the definition of testimonial statements to only those given to state actors. The Court has refused to make any pronouncement about whether statements to nongovernmental actors can be testimonial. See *Davis*, 547 U.S. at 823 n.2 (the Court finds it "unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial' "); *Bryant*, 562 U.S. at ___ n.3, 131 S. Ct. at 1155 n.3. *Bryant*–which the *Richter* court did not address–continued to treat this as an open issue, and its focus on whether the statement's primary purpose was to establish or prove past events potentially relevant to later criminal prosecution does not preclude the possibility that testimonial statements may be made to nongovernment actors. See *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1165.

¶ 65     Second, such a *per se* rule is contrary to the rulings of our supreme court, which follow a case-by-case approach. Although *Stechly* was only a plurality opinion, our supreme court has since adopted the *Stechly* framework in two subsequent cases, *Sutton* and *Rolandis G*. These cases both dealt with statements given to law enforcement personnel, so the court has not had a chance to specifically revisit the *Stechly* plurality's determination that a testimonial statement does not need to be given to government personnel. But we note that none of the justices have explicitly disapproved of the plurality's determination that a testimonial statement does not require government involvement. Moreover, we disagree with the *Richter* court's assertion that Justice Kilbride did not address the plurality's determination that testimonial statements did not require government involvement. See *Richter*, 2012 IL App (4th) 101025, ¶ 161. In fact, Justice Kilbride's concurrence in *Stechly* states that the child's statement to her mother was testimonial, so in addition to the three justices in the plurality, he would also reject the argument that testimonial statements necessarily require government involvement. See *Stechly*, 225 Ill. 2d at 329 (Kilbride, J., concurring in part and dissenting in part). In addition, the shifting intent established by *Stechly* and reiterated in *Sutton*–that the focus is on the intent of the questioner when the statement is in response to law enforcement interrogation, but on the intent of the declarant when not given to law enforcement personnel (see *Sutton*, 233 Ill. 2d at 111)–necessarily requires that statements do not need to be given to law enforcement to be testimonial. Because the court adopted the *Stechly* framework in *Rolandis G*. and *Sutton*, it may have implicitly adopted *Stechly*'s determination that a testimonial statement does not need to be given to government personnel.

¶ 66     Finally, while a thorough review of the historical underpinnings of the confrontation clause is outside of the scope of this opinion, we note the *Stechly* plurality's determination that a *per*

*se* rule requiring government involvement had little basis in legal history. See *Stechly*, 225 Ill. 2d at 287 (citing Richard D. Friedman, *Crawford and Beyond: Exploring the Future of the Confrontation Clause in Light of the Past: Grappling With the Meaning of "Testimonial"*, 71 Brook. L. Rev. 241 (2005)).[3]

¶ 67     We agree with the *Richter* court that the primary evil which the confrontation clause seeks to address involves statements made to government personnel. See *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1155 ("[T]he most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial."). However, without definitive guidance from our superior courts, we are not prepared to say that government involvement marks the outer boundaries of what the confrontation clause protects.

¶ 68                                               CONCLUSION

¶ 69     For the foregoing reasons, the judgment of the circuit court of Tazewell County is affirmed.

¶ 70     Affirmed.

¶ 71     JUSTICE SCHMIDT, specially concurring.

¶ 72     I concur in the judgment. As the majority notes, the State has requested that we adopt a *per se* rule set forth in *Richter*. *Supra* ¶ 63. The majority also acknowledges that there is no need for us to weigh in on *Richter* in order to resolve this case.

¶ 73     Whether or not statements to a nongovernmental entity can ever be testimonial for purposes of *Crawford* is, of course, ultimately a federal constitutional question that will someday be decided by the United States Supreme Court. However and whenever the Supreme Court decides the issue, it seems unlikely that it will give the same weight to Professor Graham's opinion as does the *Richter* majority.[4]

¶ 74     In a nutshell, since it is unnecessary to the resolution of this case, I see no reason to adopt *Richter*; additionally, I see no reason to either agree or disagree with *Richter* and therefore do not join in paragraphs 63 through 67 of the majority opinion.

---

[3]A historical illustration of the scope of an accused's right of confrontation can be seen in the framing-era English case of *King v. Braiser*, which the Court cited in *Davis*. In that case, a young girl who had just been raped described the incident to her mother, and the mother's testimony at trial relaying the daughter's account was held inadmissible. See *Davis*, 547 U.S. at 828 (citing *King v. Braiser*, (1779) 168 Eng. Rep. 202 (K.B.); 1 Leach 199); *Bryant*, 562 U.S. at ___, 131 S. Ct. at 1173 (Scalia, J., dissenting) (citing *Braiser*, 168 Eng. Rep. 202; 1 Leach 199).

[4]While the *Richter* majority suggests that Illinois courts ought to genuflect to Professor Graham (*Richter*, 2012 IL App (4th) 101025, ¶¶ 128-31), ironically or perhaps, appropriately, it was Justice Pope who declined to sign on to the notion of Graham's infallibility. *Id.* ¶ 170 (Pope, J., specially concurring).