**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 230683-U

Order filed January 21, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0683 Circuit No. 23-CF-71 |
| JERMAINE MANDLEY, | ) ) ) | Honorable David M. Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Brennan and Justice Bertani concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   Any error in admitting the officer's testimony was harmless.

¶ 2     Defendant, Jermaine Mandley, appeals from his convictions. Defendant argues the trial court erred by admitting an officer's testimony regarding previous domestic violence statements provided by the deceased victim as such statements violated defendant's sixth amendment right to confront the evidence against him. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4        Defendant was charged on January 10, 2023, with three counts of first degree murder (720 ILCS 9-1(a)(1), (2) (West 2022)). The charges alleged defendant shot and killed Maya Smith on January 7, 2023.

¶ 5        The State filed a motion *in limine* seeking to admit evidence of a prior incident of domestic violence involving defendant and Smith through the testimony of Sergeant Paul Potts of the Channahon Police Department. On June 13, 2022, officers responded to a report of a woman screaming around midnight. The residents refused to open the door for the responding officers. The next morning at 9:30 a.m., Potts conducted a welfare check at the residence. Melissa Sims, Smith's mother, told Potts that Smith was battered the night before and that Smith wanted to file a police report. Potts then spoke to Smith, who alleged defendant battered her the previous night. Defendant objected to the testimony, arguing it violated his right to confront the evidence against him. The court granted the State's motion.

¶ 6        The case proceeded to a jury trial on August 14, 2023. Officer Jack Desiderio of the Joliet Police Department testified he responded to a report of a vehicle blocking an alleyway on January 8, 2023, shortly after midnight. Inside the locked vehicle, Desiderio observed a female in the front seat who had been shot multiple times and a child in the back seat. The deceased female was later identified as Smith. The child in the back seat was later identified as Smith's daughter, A.Y., who was two years old at the time of the incident. Smith had suffered seven gunshot wounds from a 10-millimeter firearm. There was a bottle of 1738 Remy Martin Cognac on the passenger side floor of the vehicle.

¶ 7        Security footage from the area was admitted into evidence. The videos showed Smith's vehicle enter the alley and park at 5:47 p.m. on January 7, 2023. At 5:54 p.m., an adult man, similar in height and build to defendant, wearing a dark coat and light jeans exited the passenger side of

2

the vehicle. With the passenger door still open, the man leaned inside the vehicle. Several bright flashes could be seen on the video. The man then jogged down the alley before turning around and jogging back to the vehicle. The man stood beside the vehicle appearing to try to open the passenger door for a few moments before jogging down the alley in the direction of David Ervins's house less than a minute later.

¶ 8    Ervins testified he lived on the same block as the location of the shooting. Ervins, Charlean Garrison, and Carse Brown were at Ervins's house to watch a fight on January 7, 2023. Defendant and Ervins were coworkers. Defendant text messaged Ervins earlier that day indicating he would visit Ervins's house to watch the fight. Ervins and defendant spoke on the phone sometime between 4:11 and 5:07 p.m. Defendant stated he was with Smith, "making some runs," and he would be to Ervins's house later. When defendant arrived at Ervins's house, he "bang[ed]" on the door as opposed to a "normal door knock." Defendant was "trying to really get in[side]," and appeared nervous and out of breath.

¶ 9    Ervins had home surveillance cameras near his front and back doors facing outside the home. Footage showed defendant approach the front door at 5:58 p.m. Defendant was breathing heavily. He knocked on the door several times. While waiting for someone to open the door, defendant stated, "I killed that bitch."

¶ 10    Ervins testified defendant and Brown went to the liquor store before the fight began. Ervins knew defendant always kept a pistol with him, and asked defendant to leave it at Ervins's house. Defendant pulled the pistol out of his coat pocket and left it on the floor. Ervins believed it was a 9-millimeter pistol but testified he would be unable to discern between a 9-millimeter and 10-millimeter pistol. Defendant returned to Ervins's house with a bottle of 1738 Remy Martin Cognac

and a six pack of Mike's Hard Lemonade. The Cognac was a gift for Ervins. Defendant drank the entire six pack "in about five minutes."

¶ 11     At one point in the evening, defendant exited the house. The surveillance footage showed defendant exit the back door at approximately 7:16 p.m. and walk out of the camera's view. Defendant can be heard saying, "She's dead. Call that bitch now." Ervins testified the video showed defendant walking toward a fence over which it was possible to see the alley where the shooting occurred. Both home surveillance videos were admitted into evidence.

¶ 12     The fight finished around midnight. Defendant asked Ervins to call him a Lyft because his phone was broken. Garrison ordered defendant a Lyft. When the Lyft arrived, there were several police officers in the alley. Ervins testified defendant appeared nervous upon seeing the officers and asked him to walk him to the Lyft, but Ervins declined. A video taken from inside the Lyft was admitted into evidence. It showed defendant entering the back seat of the vehicle at 1:02 a.m. on January 8, 2023, wearing a dark coat and light jeans. Ervins testified defendant had previously told him he "got into it with [Smith] one day and he was grabbing her and put her in the trunk of her car."

¶ 13     Garrison's and Brown's testimony was consistent with that of Ervins. Brown noted that, when defendant removed the firearm from his coat pocket before going to the liquor store, the slide of the gun was back "[l]ike it had been discharged." Brown further testified that throughout the night, defendant walked up and down the basement stairs 15 to 20 times while mumbling to himself. From the mumbles, Brown was only able to make out the word, "bitch."

¶ 14     Sims testified Smith was in a relationship with defendant from the middle of 2022 to December 2022. Chelsie Mandley, defendant's wife, testified she had been married to defendant for three years. Chelsie learned defendant was romantically involved with Smith in 2022. On either

4

December 15 or 16, 2022, Chelsie ended her relationship with defendant, changed her phone number, and did not leave him any of her contact information. On January 8, 2023, defendant reached out to Chelsie via Snapchat. Defendant wanted Chelsie to "[h]elp him flee." A recording of a voice conversation between Chelsie and defendant was introduced into evidence. During the conversation, defendant asked Chelsie to pick him up at a casino in Indiana. Defendant stated he worried someone might "ping" Chelsie's phone because she was defendant's wife. Chelsie contacted the police after the call.

¶ 15    Over defendant's objection, Potts testified he conducted a welfare check on June 13, 2022, at approximately 9:30 a.m. for a woman who was heard screaming the previous night around midnight. The residents refused to open the door to responding officers the night before. Potts came into contact with Sims and Smith. Potts observed Smith had a cut lip, broken tooth, broken fingernails, and other marks and abrasions. Photographs of the injuries were admitted into evidence. Potts testified Smith told him she and defendant had a disagreement the night before. At one point, defendant picked Smith up and attempted to throw her in the trunk of his vehicle. Smith began screaming and fighting defendant to get away. Defendant grabbed Smith by the throat, "to where she couldn't breathe," and hit her several times.

¶ 16    The State introduced text messages between defendant and Smith. On December 25, 2022, Smith informed defendant she was still in love with A.Y.'s father, Remy. After several text messages discussing the matter, Smith told defendant three times to "leave [her] alone." During the conversation, Smith also text messaged, "Stop texting me," "You've hurt me twice," "You not listening and that's scaring me," and "I'm done and I can't allow you [i]n my life."

¶ 17    The State introduced evidence establishing Smith called defendant on January 7, 2023, at 4:53 p.m., and they spoke until 5:09 p.m. The phone data showed both Smith's and defendant's

phones were located around defendant's house at that time. No further data was available from defendant's phone. Data from Smith's phone showed her traveling to the area of the shooting, stopping in the alley at 5:47 p.m., and not changing locations until January 8, 2023, at 1:10 a.m. A.Y. was in the vehicle the entire time. Smith's phone was connected to the Bluetooth in her vehicle. Smith received a call from Remy's mother at 5:35 p.m. which lasted 12 minutes and 40 seconds. Smith received a second phone call at 5:48 p.m. The contact was saved as "♥ Remy ♥." The caller left a voicemail. DNA from defendant, Smith, and two unidentified individuals was recovered from the front passenger door handle of the vehicle.

¶ 18    The jury returned a verdict of guilty on all counts and found defendant personally discharged a firearm that proximately caused death to another person. At a posttrial hearing, defendant argued, *inter alia*, Potts's testimony was inadmissible under the confrontation clause of the sixth amendment. The court denied defendant's motion as to that issue. Defendant was sentenced to natural life imprisonment. This appeal followed.

¶ 19                                              II. ANALYSIS

¶ 20    On appeal, defendant argues Potts's testimony violated the confrontation clause of the sixth amendment. The State confesses error, but argues the error was harmless because the evidence was overwhelming. "To be properly admitted, an out-of-court statement must satisfy both a hearsay exception and a defendant's rights under the confrontation clause." *People v. Palomera*, 2022 IL App (2d) 200631, ¶ 30. Under *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), out-of-court statements are admissible at trial, under the sixth amendment, "only if they were not testimonial or if the defendant had a prior opportunity for cross-examination." *People v. Busch*, 2020 IL App (2d) 180229, ¶ 54. Testimonial statements are statements which are made in a solemn fashion and are intended to establish a particular fact at trial. *People v. Cleary*, 2013 IL App (3d)

6

110610, ¶ 56. Statements to law enforcement are testimonial if there is no ongoing emergency and the primary purpose is to establish a fact relevant for later criminal prosecution. *Id.* ¶ 48. "If the statement is the product of law enforcement interrogation, it is the intent of the questioner eliciting the statement that is determinative." *Id.* Statements to officers are nontestimonial where the circumstances surrounding the statements objectively indicate the primary purpose of the interrogation was to meet an ongoing emergency. *People v. Sutton*, 233 Ill. 2d 89, 110 (2009).

¶ 21        Here, the statements at issue were made as part of an officer's interrogation and therefore in a solemn fashion. See *Cleary*, 2013 IL App (3d) 110610, ¶ 56. The primary purpose of the questioning was to establish a fact relevant to later criminal prosecution. See *Sutton*, 233 Ill. 2d at 115. The surrounding circumstances objectively indicate there was no ongoing emergency. Potts arrived approximately nine hours after the initial report of a woman screaming and was informed by Sims that Smith wished to file a report regarding a battery. Nothing in Potts's testimony or police report objectively indicate the primary purpose of his interrogation of Smith was to meet an ongoing emergency. Therefore, the statements were testimonial in nature. Smith's statements, presented through Potts's testimony, violated defendant's sixth amendment right to confront the evidence against him and we accept the State's confession of error.

¶ 22        We note the hearsay statements by Smith regarding the battery only run afoul of the confrontation clause because they are testimonial. See *People v. Connolly*, 406 Ill. App. 3d 1022, 1027 (2011) ("The confrontation clause does not apply, however, if the statements are not testimonial."). "Statements to friends and neighbors about abuse and intimidation *** would be excluded, if at all, only by hearsay rules ***." *Giles v. California*, 554 U.S. 353, 376 (2008). Here, assuming the evidence was otherwise admissible, Smith's hearsay statements regarding the June 13, 2022, battery could have been introduced through the testimony of Sims or another witness

with whom Smith discussed the battery in a nontestimonial manner. See, *e.g.*, *Cleary*, 2013 IL App (3d) 110610, ¶ 58 (statements to the deceased's friends were not testimonial because they were neither made in a solemn fashion nor intended to establish a particular fact at a subsequent trial).

¶ 23    Though it was error to allow Potts's testimony, the State argues the error was harmless. Confrontation clause violations will be held harmless where it appears beyond a reasonable doubt the error did not contribute to the verdict obtained. *People v. Patterson*, 217 Ill. 2d 407, 427-28 (2005). An error is harmless if (1) the evidence overwhelmingly supports the conviction, (2) the error did not contribute to the verdict, or (3) the error concerns evidence which is only cumulative of other evidence properly presented at trial. *People v. Sanders*, 2021 IL App (5th) 180339, ¶ 67. In harmless error review, the question is what the jury would have done absent the improperly admitted evidence. *People v. Collins*, 2020 IL App (1st) 181746, ¶ 44. We must determine whether the improper evidence tipped the scales against the defendant. *Id.* "Even if the evidence is minimally sufficient, evidentiary error constitutes reversible error if we cannot say that retrial without this evidence would produce the same result." (Internal quotation marks omitted.) *Id.*

¶ 24    Here, the evidence of defendant's guilt was so overwhelming it conclusively established his guilt. Defendant and Smith were in a relationship for approximately six months. During a previous dispute, defendant, "put [Smith] in the trunk of her car," which he told Ervins. Two weeks before her murder, Smith text messaged defendant saying she still loved Remy and was ending her relationship with defendant. During that conversation, Smith told defendant to "leave [her] alone," that defendant was scaring her, and accused defendant of hurting her twice. Defendant was with Smith in her vehicle before the murder. At 5:48 p.m., while connected to her vehicle's Bluetooth, Smith received a call from "♥ Remy ♥." Approximately five minutes later, video footage showed someone matching defendant's height and build and wearing identical clothing, shoot Smith

8

multiple times before jogging away. Defendant was then captured on Ring camera footage four minutes later near the murder. He was out of breath, frantic, and nervous. Ring camera footage showed defendant stating, "I killed that bitch," and "She's dead. Call that bitch now." Defendant purchased an identical bottle of Cognac for Ervins to replace the one he attempted to retrieve from Smith's vehicle. Before going to the liquor store, defendant pulled a recently fired pistol out from his coat pocket. The day after the murder, defendant left the state and asked Chelsie to help him flee, establishing a clear consciousness of guilt. Defendant's DNA was found on the passenger side door handle of the vehicle where the murder occurred. Regardless of Potts's erroneously admitted testimony, defendant's guilt is the only reasonable conclusion the evidence permits. In other words, the State's evidence was so complete and overwhelming retrial without the hearsay statements would produce the same result. The error was therefore harmless, and we affirm defendant's convictions.

¶ 25     In coming to this conclusion, we reject defendant's argument that there was insufficient evidence because Potts's testimony was the only evidence supporting the State's theory that defendant was prone to irrational and violent behavior against women and particularly Smith. There was other evidence to support the State's theory, such as Ervins's testimony and the text messages between defendant and Smith. Regardless, the State did not need to prove defendant's motive. See *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 49.

¶ 26                                    III. CONCLUSION

¶ 27     For the reasons stated, we affirm the judgment of the circuit court of Will County.

¶ 28     Affirmed.