NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241262-U

NO. 4-24-1262

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 12, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JAYLIN BONES, | ) | No. 23CF135 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Harris and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the trial court did not abuse its discretion by dismissing a sitting juror or admitting hearsay statements as excited utterances, and it did not violate defendant's right to confrontation because the excited utterances were not testimonial statements.

¶ 2    A jury found defendant, Jaylin Bones, guilty of first degree murder, attempt (first degree murder), and aggravated battery with a firearm. The trial court sentenced him to 80 years' imprisonment in the Illinois Department of Corrections (DOC) followed by a 3-year term of mandatory supervised release. Defendant appeals, raising three arguments: (1) "[w]here the State ambushed the defense near the end of trial with allegations that a juror was excessively smiling at the defendant, (a) the court's dismissal of the juror based solely on speculation was an abuse of discretion, and (b) the State violated [defendant's] due process rights by surreptitiously gathering evidence for days rather than immediately bringing the issue to the attention of the

court or the defense"; (2) "[t]he court erred in allowing an incriminating excited utterance from Rashad Hill into evidence under the excited utterance hearsay exception"; and (3) defendant "was denied his Sixth Amendment [(U.S. Const., amend. VI)] right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004), when the trial court admitted the *** hearsay statement incriminating [him] as the shooter." As we will explain below, we reject defendant's arguments and affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        Timothy Manns was shot in the head and died in an apartment at 607 West Jefferson Street in Bloomington, Illinois, on January 24, 2022. More than a year later, in February 2023, a grand jury indicted defendant on six counts: four counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2022)), one count of attempt (first degree murder) (720 ILCS 5/8-4, 9-1(a)(1) (West 2022)), and one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2022)). The murder and attempt (murder) counts carried a firearm sentencing enhancement requiring the mandatory addition of 25 years or up to a term of natural life to the sentence (730 ILCS 5/5-8-1(A)(1)(D)(III) (West 2022)).

¶ 5        The case proceeded to a jury trial in June 2024. The State's case-in-chief spanned five days and included in excess of 25 witnesses and 75 exhibits. A jury found defendant guilty of two first degree murder counts, attempt (first degree murder), and aggravated battery with a firearm. Defendant timely moved for a judgment of acquittal notwithstanding the verdict or a new trial, which the trial court denied. During the July 2024 sentencing hearing, the court merged all the counts into one first degree murder count. It entered judgment and sentenced defendant to 80 years' imprisonment in DOC—55 years plus the 25-year firearm enhancement— followed by a 3-year term of mandatory supervised release.

¶ 6        This appeal followed.

¶ 7        Defendant's appeal focuses on two particular points at trial—the trial court's removal of Juror 2 and its admission of Rashad Hill's hearsay statements. As we consider defendant's arguments, we will expound and examine the relevant facts in the record.

¶ 8                                    II. ANALYSIS

¶ 9        Defendant challenges his conviction on three grounds, which we rephrase as: (1) the trial court abused its discretion in removing Juror 2 midtrial, and its manner of removal violated defendant's due process right; (2) the court erred in admitting Hill's hearsay statements as excited utterances; and (3) by admitting Hill's hearsay statements, the court denied defendant his sixth amendment right to confrontation. We address each issue in turn.

¶ 10                                A. Removing Juror 2

¶ 11        Four days into trial, outside the presence of the jury, the State raised a concern it "characterize[d] as improper, nonverbal communication between one of the jurors and the Defendant." The trial court interrupted, saying, "Wait. Wait. Wait. Give me one second." It explained, "I'm stopping you because I want to make sure that I'm looking because I have noticed some—it's not anything improper, but I have noticed behavior from one jury [*sic*]." The State identified the juror as Juror 2 and noted, "[E]very time *** they enter or exit the courtroom there is what I would characterize as flirty looks and smiles between them and the Defendant." The State explained, "[E]ven throughout the *** presentation of evidence that ongoing nonverbal communication is taking place regularly between the two of them in regards to flirty looks, smiles, nods, things of that nature." The State noted, "[T]he Defendant is also engaging in these looks and these interactions." The State expressed "serious concerns" regarding whether Juror 2 "is even paying attention to the evidence because they are so concerned with looking at

the Defendant ***." The State reported multiple people, including attorneys, law enforcement officers, and the victim's family, noticed the looks between Juror 2 and defendant. It argued "the appropriate remedy is to strike [Juror 2] at this time from the jury and put an alternate in their place."

¶ 12　　　Unsurprisingly, defense counsel opposed the State's position, asserting, "There has been no mouthing of words, no insinuation of hand gestures, or anything to communicate an idea." Counsel theorized the State now opposed Juror 2 because it "is not winning and they're concerned that that juror isn't buying what they're selling. That's not a reason to strike that juror." Counsel suggested Juror 2 "might not be as pleased with the State as they are with the defense" because the State used the phrase "ladies and gentlemen," even though Juror 2 used "they/them" pronouns. Counsel argued, "[T]here is no evidence whatsoever now that there's any inappropriate contact going on."

¶ 13　　　The trial court asked the State to provide more information about who had witnessed the interactions between Juror 2 and defendant, as well as "testimony under oath as to *** what they have observed."

¶ 14　　　The State called Cory Wills, a sheriff's deputy. The trial court questioned Wills, who stated he had been observing Juror 2 since 9 a.m. that day from his seat in "the third row over on the side behind defense counsel ***." He stated, "As [Juror 2] enters into this courtroom she makes direct [eye] contact with the Defendant and smiles." He testified, "Any time there's been a break she has made direct contact with the Defendant as well and smiled." Wills further stated Juror 2 would "look over the Defendant's way as if she is looking for his eye contact" while the State was presenting evidence or during witness testimony. He testified there were "multiple times" when other jurors were "all paying attention to what's going on up here" but

Juror 2 would "gaze her eyes over towards the Defendant." On examination by the State, Wills testified that he observed Juror 2 look at defendant and smile 20 times since 9 a.m. Wills described the smile as "not a cursory smile, it seems to be more than that." On examination by defense counsel, Wills stated this was his first day attending the trial and he had been asked to observe the night before. He confirmed he never saw Juror 2 mouth words towards defendant or use hand signals or wink at him. He acknowledged he could not see defendant's face.

¶ 15    The State next called Cory Beverlin, a sheriff's deputy. On examination by the trial court, Beverlin testified he had been in the courtroom as security that day, which was Friday, and earlier in the week on Tuesday. He had been "advised to kind of keep an open eye to interactions, mostly nonverbal between the Defendant and the jury." He testified he observed "several interactions with the second juror from the left in the top row similar to those that were noted by Deputy Wills." Beverlin stated he observed Juror 2 make eye contact with defendant nine times that morning. In six of those instances, both the juror and defendant smiled. In three instances, only the juror smiled. Beverlin testified he counted 11 more times in the afternoon session where Juror 2 looked at defendant and smiled. He noted he could see defendant return the juror's smile 10 times that afternoon. Beverlin explained, "Many of those [smiles] were while the jury was entering or exiting. There was one such occurrence where the juror even looked back over her shoulder as she was exiting the courtroom or walking out of the courtroom." He testified he also saw Juror 2 and defendant exchanged looks and smiles during testimony and sidebars. On examination by the State, Beverlin described Juror 2's smiles to defendant as "flirtatious in nature." On examination by the defense, Beverlin confirmed he saw no mouthed words, hand gestures, kissy faces, or winks between the juror and defendant.

¶ 16    The State next called Sergeant Paul Jones, of the Bloomington Police Department.

Jones testified he had been present for the entire trial, sitting at counsel's table with the State. Jones admitted he had not been aware of anything until one of the attorneys for the State "put it on [his] radar, and [he] began watching at that point. So all yesterday I was observing these things." He observed "flirtatious smiles sometimes initiated by [Juror 2] in the jury box and sometimes by the Defendant." That day, Jones documented his observations. At 9:23 a.m. he saw Juror 2 smile at defendant. At 9:55 a.m., after seeing autopsy photos, Juror 2 looked at defendant and made a face, "kind of like she twisted her lips up like that wasn't great." At 9:59 a.m., Jones observed Juror 2 "was gazing at [defendant] for an extended period of time." At 10:13 a.m., Jones saw defendant smile at Juror 2, who "looked at him for several seconds" but did not smile. Jones testified that at 10:35 a.m., when the jury was exiting the courtroom, Juror 2 "turned and smiled at him a few steps from the door." When the jury returned at 11:06 a.m., Jones saw Juror 2 smile at defendant after they sat down. At 11:35 a.m., Jones observed Juror 2 "gazing at the defendant again," and he defined "gazing" as "looking at him intently for several seconds beyond." Jones explained the other jurors' attention was turned in one direction while Juror 2 was "turned towards [defendant], and she is looking at him for several seconds." At 11:53 a.m., Jones saw Juror 2 smile at defendant twice.

¶ 17        Jones acknowledged there were times when he saw defense counsel smiling back at Juror 2. But he testified "there were specific times where [he] observed the Defendant trying to catch the eyes of her and her trying to catch the eyes of him."

¶ 18        On examination by the State, Jones confirmed his observations during the previous day were "just as extensive." He noted both defendant and Juror 2 would initiate eye contact and smiles. Jones testified he observed "times where [defendant] leaned forward and turned towards [Juror 2] with the upper portion of his body and smiled." Jones confirmed he saw

Juror 2 make eye contact with defendant and give a flirtatious smile when entering and exiting the courtroom. Jones testified Juror 2's eye contact with defendant was "abnormal, prolonged, and repeated." He noted he did not witness Juror 2 flirtatiously smiling at anyone else in the courtroom. On examination by the defense, Jones asserted he did not know Juror 2 personally and had never seen the juror flirt before. Jones acknowledged defendant was "smiling towards the jury." Jones confirmed he saw "nothing other than eye contact and smiles" between Juror 2 and defendant. Jones noted he did not relay his observations to the trial court or the defense before the State raised the issue.

¶ 19    The State urged the trial court to dismiss Juror 2. It estimated 20 or more instances of "flirtatious interactions" occurred between Juror 2 and defendant on Friday alone, and it argued, "[A] smile is not just a smile in this case." The State maintained, "It is so clear what is going on and it is so far out of the realm of appropriateness, of being fair and impartial." Defense counsel argued jurors are allowed to smile at defendants and defendants are permitted to smile back. Counsel insisted Juror 2 was not flirting with defendant, saying, "[T]hat's absolutely not true." Counsel asserted the State should have raised its concern about Juror 2 sooner, or, alternatively, the jury could have been admonished to pay attention to the evidence or Juror 2 could have been questioned. Counsel insisted, "There is no indication whatsoever that this juror cannot be fair and impartial." Counsel argued the State was attempting "to manipulate the jury in this case way at the end of the trial to try [to] get rid of jurors that don't seem to be believing their case." The court informed the parties it would take the weekend to consider the matter.

¶ 20    When trial resumed on Monday morning, the trial court addressed the State's request to remove Juror 2. The court explained it considered "all the evidence presented in this matter, the testimony, the proffer, the arguments, and *** [its] own observations." The court

began by noting, "[J]ust making eye contact with someone and smiling is not an issue," but "doing it over and over for a prolonged period can certainly be a different thing and a concern." The court noted the testimony "was fairly similar" in that "they testified that this juror was making eye contact and smiling" and each witness described the looks as flirtatious. The court found the officers' testimony "credible and believable on this issue." The court explained the "volume of the activity [was] a concern," noting Wills and Beverlin testified "it was 20 or more times in just one day that they saw this interaction." The court then noted its own observations, explaining, "Last Thursday, I noted that Juror 2 was sometimes not watching the witness, the exhibit, or the questioning attorney." The court said, "Juror 2 was oftentimes looking to something towards my left side." The court noted Juror 2's behavior prompted it to "start[ ] paying attention a little bit more than [it] normally might." The court acknowledged people listen and absorb information differently but repeated, "Multiple times on Thursday as [it] was watching the jurors, [it] saw everyone looking at the witness or the exhibits except oftentimes, multiple times, Juror 2 was looking across the courtroom."

¶ 21　　　　The trial court explained it paid more attention to Juror 2 on Friday. It noted, "Again, repeatedly, while every single other member of the jury was observing an exhibit or witness, [it] repeatedly saw Juror 2 looking across the room in either the direction of either defense table or family members behind the defendant." The court acknowledged it could not know exactly what Juror 2 was looking at. The court further noted, "[T]here were two times that [it] observed on Friday Juror 2 looking back at the defense table while the jurors were exiting the courtroom." The court described one instance as "odd," explaining, "Juror 2 was walking out and smiling and looking back over her shoulder for several steps." The court found the behavior "out of place *** and *** at that moment, it certainly seemed like it was a flirtatious manner of doing

it." The court recalled it made eye contact with Juror 2 "about three times, and every time, they almost immediately looked down, and there was [a] nervous reaction."

¶ 22    The trial court stated it had planned to inform the parties of its observations when evidence closed. It acknowledged its "observations of the juror [were] different from the deputies and officer," but they were not inconsistent because "the testimony of the deputies and officer corroborated what the Court was observing." For example, the court noted, like Jones, it also saw Juror 2 "gazing for extended times at the defendant." The judge explained, "I have been in the criminal courtroom for over 25 years," and "I have never observed a juror behave this way. And the testimony of three credible witnesses just corroborates that for me." The court removed Juror 2, concluding:

> "I see two issues here. I know the parties are focused on
> possible bias. I'm also concerned about that, but I also have the
> concern of whether Juror 2 is paying attention to the trial. I'm
> finding Juror 2 seems to be flirting with the defendant, and that can
> clearly be a sign of bias. Juror 2 appears to have an infatuation
> with the defendant based on the testimony, again, I find credible.
> I'm also finding that Juror 2 is not paying attention or selectively
> paying attention to evidence in a manner that they are not able to
> uphold their oath to objectively, dispassionately decide the case
> solely on the facts and the law."

Once the court informed Juror 2 of their removal, the trial resumed. For deliberations, the court elevated the second alternate to guarantee defendant was tried by a jury consisting of 12 members.

¶ 23    First, defendant argues the trial court abused its discretion in removing Juror 2. Second, defendant argues procedure by which Juror 2 was removed denied him his rights to an impartial jury and due process. We disagree on both points.

¶ 24    A jury must be impartial and unbiased, meaning it must be "capable and willing to decide the case solely on the evidence before it." *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶ 20. Due process requires both an impartial jury and a trial judge keeping watch over the jury to prevent misconduct and protect it from internal or external prejudicial influences. *People v. Runge*, 234 Ill. 2d 68, 103 (2009) (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

¶ 25    The trial court, therefore, enjoys broad discretion in overseeing the jury during trial. See *People v. Roberts*, 214 Ill. 2d 106, 121 (2005). "Once a juror has been selected and sworn, it is within the trial court's discretion to dismiss the juror and replace him with an alternate." *People v. Jarnagan*, 154 Ill. App. 3d 187, 197 (1987). Jurors can be replaced midtrial for misconduct that calls into question their ability to be "fair and impartial." *Runge*, 234 Ill. 2d at 104. The party challenging a juror's suitability bears "[t]he burden of establishing that a juror has a disqualifying state of mind." *Jarnagan*, 154 Ill. App. 3d at 197. "A mere suspicion of partiality is not enough" to remove a juror. *Jarnagan*, 154 Ill. App. 3d at 197.

¶ 26    There is no one-size-fits-all procedure for investigating juror misconduct or removing a juror. "[T]he trial court has wide discretion in deciding how to handle and respond to allegations of juror bias and misconduct that arise during a trial." *Runge*, 234 Ill. 2d at 105. And discretion necessarily implies " 'that there is [a] range of options open, which means more than one choice is permissible.' " *Runge*, 234 Ill. 2d at 105 (quoting *United States v. Dominguez*, 226 F.3d 1235, 1247 (11th Cir. 2000)). The court may elect to admonish the whole jury or question individual jurors or take evidence from the parties, including witness testimony. However,

"reviewing courts have recognized that 'sometimes less is more' when it comes to judicial investigation of alleged juror misconduct." *Runge*, 234 Ill. 2d at 104.

¶ 27　　　　When a party appeals a trial court's decision to replace a juror and seat an alternate, it must show the court abused its discretion and "there must be some definite showing of prejudice." *People v. Ward*, 154 Ill. 2d 272, 305 (1992); see *People v. Rose*, 191 Ill. App. 3d 1083, 1096 (1989) ("The discharge of a juror and the impaneling of an alternate is an act of discretion by the trial judge, and absent a clear showing of prejudice, reversal is not required."). "Each case must be determined on its own facts and circumstances." *Runge*, 234 Ill. 2d at 106.

¶ 28　　　　1. *The Trial Court Did Not Err in Removing Juror 2 and Seating the Alternate*

¶ 29　　　　Defendant argues the trial court abused its discretion because it "failed to question Juror No. 2 at all, and instead based the decision to dismiss the juror wholly on [its] own speculation and the speculation of police witnesses prepared *ex parte* by the prosecution." The record and the law wholly refute defendant's claims.

¶ 30　　　　Here, the trial court investigated the State's allegations of Juror 2's conduct by requesting witness testimony and comparing it to its own observations. It certainly could have questioned Juror 2 before removal but chose not to. It exercised discretion. As we said, the trial court had "wide discretion in deciding how to handle and respond to allegations of juror bias and misconduct that [could] arise during a trial." *Runge*, 234 Ill. 2d at 105.

¶ 31　　　　Defendant cites our opinion in *Curtner*, which states "[t]he trial court should inquire of the juror to discover as much information as possible." *Curtner*, 2012 IL App (4th) 110820, ¶ 21. Defendant's citation is accurate, but *Curtner* relays best practices and does not announce a hard-and-fast rule. We said "should" and not "must." *Curtner*, 2012 IL App (4th) 110820, ¶ 21. Depending on the particular facts and circumstances of a case, a court probably

*should* question a juror, but it is not *required* to do so. Each case is different and must be decided on its own circumstances. *Runge*, 234 Ill. 2d at 106. Discretion arises from having a choice to make. *Runge*, 234 Ill. 2d at 105. If we say a trial court must question a juror, then the court no longer has a choice to make in handling juror misconduct. To be sure, the *Runge* court instructed that a court "must assess the particular circumstances before it to ascertain whether questioning individual jurors might compound the problem by drawing attention to it." *Runge*, 234 Ill. 2d at 104. And, recall, sometimes less is more when it comes to managing a jury. *Runge*, 234 Ill. 2d at 104. The court inquired into allegations of Juror 2's bias through witness testimony, which it then compared to its own observations. Based on these circumstances—a juror behaving in a way the court had never seen in over 25 years in the criminal courtroom and in a way two of three witnesses and the court described as "flirtatious"—we cannot say the trial court's decision not to question Juror 2 before removal amounts to an abuse of discretion. See *Ward*, 154 Ill. 2d at 305.

¶ 32       We likewise reject defendant's claim the trial court based its decision on speculation. The State's witnesses testified similarly, and the court found them credible. Wills and Beverlin testified they observed defendant and Juror 2 exchange looks and smiles approximately 20 times on Friday. Wills described the smiles as "not cursory smile[s], it seems to be more than that." Beverlin, meanwhile, described the smiles as "flirtatious in nature." Jones testified similarly but added greater detail, as he logged and time-stamped each observation. He observed eight interactions between Juror 2 and defendant between 9:23 a.m. to 11:53 a.m. on Friday. He described Juror 2 gazing at defendant and smiling at him. He observed both Juror 2 and defendant trying to get the other's attention. Like Wills, Jones testified Juror 2 would be looking at defendant while the other jurors were observing the presentation of evidence. Despite

defendant's claim on appeal, there is no evidence the State's witnesses coordinated their testimony or that anyone told them what to say.

¶ 33　　　　Juror 2's blatant behavior did not escape the trial court's attention, and the witnesses' testimony corroborated what the court noticed. Like the witnesses, the court also observed Juror 2 looking and smiling at defendant when entering and exiting the courtroom, which the court described as "odd" and "out of place" because "it certainly seemed like it was a flirtatious manner of doing it."

¶ 34　　　　None of this is speculation. The State established more than a mere suspicion of Juror 2's disqualifying state of mind. See *Jarnagan*, 154 Ill. App. 3d at 197. The trial court noted the State's witnesses' testimony "was fairly similar" and deemed it credible. More importantly, defendant has not alleged, let alone shown, how the court's decision to remove Juror 2 prejudiced him. *Ward*, 154 Ill. 2d at 305. Defense counsel fully participated in *voir dire* and did not object to the alternate juror the court eventually seated in Juror 2's place. There is no indication in the record any other juror showed bias or partiality toward the defense or the State. Defendant is not constitutionally entitled to a jury of his own choice, but he is guaranteed the right to an impartial jury chosen in a joint effort by the State and the defense. *Ward*, 154 Ill. 2d at 305. Because defendant has not made a definite showing of prejudice, his argument the trial court erred in removing Juror 2 fails. *Ward*, 154 Ill. 2d at 305.

¶ 35　　　　　　　　　2. *The Trial Court's Decision Did Not Violate*

*Defendant's Rights to Due Process or an Impartial Jury*

¶ 36　　　　Defendant next argues "the [trial] court violated [his] due process rights and right to an impartial jury when it allowed the State to ambush the defense with surreptitiously pre-prepared witnesses at the end of trial in order to remove Juror Number 2." We disagree.

- 13 -

Couching one's allegations in such loaded language does not make them true. Had the State failed to investigate its suspicions adequately before acting, defendant's claim would be based on its hasty action and lack of evidence to support removal. The State's decision to ask witnesses to verify the behavior in question, and doing so before bringing the matter to the trial court's attention, was both prudent and cognizant of defendant's due process rights. Had the State withheld its information and defendant learned about it after his conviction, defendant's claim would be modified accordingly, and had the State been required to inform defense counsel immediately, a brief conversation with his client could have prevented anyone from discovering what transpired, thereby interfering with the fundamental fairness expected in a criminal trial.

¶ 37       Defendant directs our attention to *United States v. Harbin*, 250 F.3d 532 (7th Cir. 2001), and *People v. Brown*, 2013 IL App (2d) 111228, where the State unilaterally changed the jury by using a peremptory challenge after the jury had been impaneled and sworn. In *Harbin*, 250 F.3d at 538, six days into trial, a juror informed the district court he knew the mother of one of the State's witnesses. The court questioned the juror and declined to dismiss him for cause. However, the court allowed the State to use "one of its peremptory challenges 'left over' from jury selection, based on the newly discovered information." *Harbin*, 250 F.3d at 538. The Seventh Circuit reversed, finding the trial court's "decision to allow the government to unilaterally alter the composition of the jury mid-trial" violated due process. *Harbin*, 250 F.3d at 541-42. The court deemed the error structural, "requir[ing] automatic reversal." *Harbin*, 250 F.3d at 549.

¶ 38       In *Brown*, during a witness's testimony, a juror realized a connection he had to the defendant's parents. Upon questioning by the court, the juror "said that he had not had any contact with [the] defendant or her parents, but knew of their tie to the shooting" that killed his

cousin. *Brown*, 2013 IL App (2d) 111228, ¶ 13. The juror confirmed he could still be impartial, however. *Brown*, 2013 IL App (2d) 111228, ¶ 13. Over the defense's objection, the trial court allowed the State to use a peremptory challenge and removed the juror. *Brown*, 2013 IL App (2d) 111228, ¶ 14. Finding no Illinois precedent on point, the *Brown* court followed *Harbin* and found the court committed structural error when it permitted the State to use a peremptory challenge midtrial. *Brown*, 2013 IL App (2d) 111228, ¶¶ 20, 32.

¶ 39    Defendant likens the State's decision to raise its concerns about Juror 2 on Friday afternoon, four days into trial, near the close of the evidence, to the State's use of midtrial peremptory challenges in *Harbin* and *Brown*. He requests reversal, maintaining "the method the State chose to use in seeking removal of the juror resulted in a fundamental unfairness" because "[it] employed an intentionally unilateral method of removal with the same end-goal as the use of a peremptory challenge."

¶ 40    We find *Harbin* and *Brown* inapt and unpersuasive. We cannot make the connection between peremptory challenges, where no cause or reason is necessary to exclude a prospective juror, and the situation here, where the State raised its concerns about Juror 2 and then produced witnesses and argument to substantiate its concerns. The situation here is more like a challenge for cause, which requires some level of proof and analysis. Another factor distancing this case from *Harbin* and *Brown* is the trial court's independent observation of Juror 2's unusual behavior and its plan to make the parties aware of it. Indeed, the court said, "I planned on continuing to make note of what I was seeing before the close of evidence and bring it to the attention of the parties, but this ended up getting brought up sooner." The record simply does not support defendant's theory that the State usurped the court's authority and unilaterally changed the jury midtrial. The State produced witnesses on direction from the court. The court

took the lead in questioning the witnesses. Following argument from both parties, the court took the weekend to consider the matter. This is what we call deliberation. When the trial resumed, the court then made credibility findings and noted the testimony corroborated its own observations. The court found Juror 2 demonstrated bias and inattention that prevented them from "uphold[ing] their oath to objectively, dispassionately decide the case solely on the facts and the law." Instead of focusing on what the many looks, glances, and gazes might mean, the court made an objective assessment regarding their effect on the juror's ability to listen and observe the evidence, as required by their oaths. Unlike the *Harbin* and *Brown* peremptory challenges, no party unilaterally changed the jury. Consequently, this case does not merit the same result as those cases. There was no violation of defendant's rights to due process and an impartial jury. See *Runge*, 234 Ill. 2d at 103 (stating due process requires an impartial jury and a judge watchful for misconduct).

¶ 41                                 B. The Hearsay Statements

¶ 42        Defendant next argues "the [trial] court erred in allowing an incriminating excited utterance from Rashad Hill into evidence under the excited utterance hearsay exception." We disagree.

¶ 43        Manns was murdered in Hill's apartment on January 24, 2022. As Hill fled the scene, he called Deandre Johnson. The State subpoenaed Hill, but he did not appear or testify at trial. The State called Johnson and asked him about his phone call with Hill, particularly what Hill told him about the murder. The defense objected on hearsay grounds, which the trial court overruled, allowing the testimony under the excited utterance exception to the hearsay rule.

¶ 44        Johnson testified he was familiar with both defendant and Hill. He recounted he went to Hill's Jefferson Street apartment around 4 p.m. on January 24 to collect $200 he had

loaned Hill. During the 10 to 15 minutes Johnson was in the apartment, Manns arrived, and Hill let him in through the back door. Johnson testified he left once Hill paid him $70 and promised to send him the remaining $130 via Cash App later that evening.

¶ 45 Johnson testified he called Hill four or five times during that afternoon and evening to inquire when he would receive the rest of his money. When Hill called him at 7:14:25 p.m., Johnson answered, anticipating Hill would tell him he sent the money. However, he heard Hill "breathing hard," and so he asked him, "[W]hat was he breathing so hard for?" Hill responded, "I'm running down the alley." Johnson asked Hill why he was running, and Hill said, "[W]ell, I let *** J in the house and I walked to the front room. Once I walked to the front room I heard gunshots so I took off running out the front room." Johnson testified that when Hill said, "J," he knew Hill was referring to defendant. He noted he did not talk to Hill again that night.

¶ 46 The Illinois Rules of Evidence govern the admissibility of such statements. *People v. Brand*, 2021 IL 125945, ¶ 36. Those rules define "hearsay" as an out-of-court statement offered in court to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay evidence is inadmissible unless the rules provide an exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011). "One such exception exists for excited utterances, also referred to as spontaneous declarations." *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 30 (citing Ill. R. Evid. 803(2) (eff. Apr. 26, 2012)). The rules define an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Sept. 28, 2018). "[T]he excited utterance exception to the hearsay rule was based on human experience," specifically, when "people are under physical or mental shock, they experience a stress of nervous excitement which produces a statement that expresses the real belief of the speaker as to the facts just

observed." *People v. Connolly*, 406 Ill. App. 3d 1022, 1024 (2011). In other words, the excited utterance exception exists because qualifying statements made under these conditions are deemed reliable, and therefore admissible.

¶ 47 "To admit a statement under the excited utterance exception, a [trial] court must find that (1) there was 'an occurrence sufficiently startling to produce a spontaneous and unreflecting statement,' (2) the declarant lacked time to fabricate the statement, and (3) the declarant's statement relates to the circumstances of the startling occurrences." *Kinnerson*, 2020 IL App (4th) 170650, ¶ 31 (quoting *People v. Sutton*, 233 Ill. 2d 89, 107 (2009)). A court considering whether a hearsay statement satisfies these three requirements " 'should consider the totality of the circumstances,' " like " 'time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest.' " *Kinnerson*, 2020 IL App (4th) 170650, ¶ 32 (quoting *Sutton*, 233 Ill. 2d at 107).

¶ 48 We review a "[trial] court's evidentiary rulings on hearsay testimony and any applicable exceptions" for an abuse of discretion. *People v. Burney*, 2011 IL App (4th) 100343, ¶ 40. The court abuses its discretion when its ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would" arrive at the same ruling. (Internal quotation marks omitted.) *Burney*, 2011 IL App (4th) 100343, ¶ 40.

¶ 49 Defendant's appeal seemingly challenges only the second element of the excited utterance exception, arguing that because "Hill had a significant motive to fabricate his statements and there was conflicting evidence as to how much time had actually passed between the shooting and Hill's running away from the scene, the totality of the circumstances did not support allowing the statements to come in." To be sure, defendant does not challenge that Hill witnessed a sufficiently startling occurrence—seeing a fight in his kitchen and then hearing

gunshots. Nor does defendant challenge that Hill's statements to Johnson related to the shooting—stating "J" came to the apartment and then he heard gunshots. Consequently, we confine our analysis to the exception's time element only.

¶ 50        First, we review the evidence establishing the broader context for the timeline. The State presented evidence showing defendant's girlfriend owned a white Honda Civic, to which defendant enjoyed unfettered access. The State then presented video evidence showing defendant possessed and drove the Civic on January 24, 2022, even while his girlfriend was working in the evening. The evidence further showed defendant wore dark jeans, brown boots, and a dark puffy coat throughout the day on January 24. Bryant McClellan, Manns's friend who accompanied him to Hill's apartment but waited outside in the car, testified he saw a white car pull into the apartment's driveway. He recalled seeing a man wearing a puffy coat exit the car and enter Hill's apartment through the back door. He eventually heard two rapid gunshots and saw a man wearing a puffy coat run out of the apartment and drive away in the white car, turning right onto Jefferson Street.

¶ 51        Branden Swan testified he was in Hill's apartment playing video games when Manns arrived on January 24. Swan never identified defendant as being present in the apartment. However, he recalled someone wearing a ski mask arriving at the back door and that person immediately attacked Manns in the kitchen, trying to take his gun. Incidentally, other evidence confirmed defendant owned a similar ski mask. Swan testified he and Hill ran out of the apartment's front door while Manns wrestled his killer, and he heard gunshots once he was outside the apartment.

¶ 52        As for the timeline, testimony from several witnesses placed Manns at Hill's Jefferson Street apartment a little after 4 p.m. on January 24, 2022. Notably, Johnson testified,

when he was there from about 4 p.m. to 4:15 p.m., he saw Hill, another man (Branden Swan), Hill's girlfriend, and Manns in the apartment. At some point, Hill's girlfriend left, leaving the three men alone in the apartment. Though they were sitting near each other in the same room, Hill texted Swan at 6:56:13 p.m., encouraging Swan to take Manns's gun or money or both. The message read: "Moe, he a stain. He got 1300 on him and a pole. You can take it. He a sucker." And minutes later, at 7:05:56 p.m., Hill again texted Swan about Manns, saying "Moe, ask him to see his pole." "Pole," as it was established at trial, is a slang term for a gun.

¶ 53 Meanwhile, the record indicates defendant arrived at Hill's apartment between those two text messages. Besides cell tower data placing defendant in the area around this time, surveillance video from the neighboring Salvation Army building showed a white Civic traveling down Jefferson Street and backing into the driveway of Hill's apartment building at 6:59 p.m.

¶ 54 The timeline is silent from 7:05 p.m. to 7:13 p.m., until the Salvation Army surveillance video showed two subjects running west—the opposite direction from Hill's apartment—along Jefferson Street from 7:13:05 p.m. to 7:13:14 p.m. The same video showed a white Civic following along Jefferson Street away from Hill's apartment at 7:13:42 p.m. Cell phone records confirm Hill called Johnson at 7:14:25 p.m., when he would have been running from the apartment. Other surveillance camera video shows two subjects, identified as Hill and Swan, running to a liquor store around 7:20 p.m.

¶ 55 We infer from the evidence that Manns was shot sometime between 7:05 p.m. and 7:13 p.m., which means Hill's 7:14:25 p.m. phone call to Johnson took place less than 10 minutes after the altercation and shooting, perhaps even within 1 minute of the murder. Defendant, nevertheless, claims Hill had enough time to fabricate his statements to Johnson. Defendant pins his argument on the time between when the white Civic arrived at 6:59 p.m. and

when Hill, Swan, and the white Civic fled the apartment at 7:13 p.m. He claims that time frame does not jibe with Swan's testimony that the person who entered the apartment by the back door immediately wrestled with Manns and shot him. Defendant reasons, then, that if the shooter arrived, entered the apartment at 6:59 p.m., and murdered Manns within seconds, but no one left until 7:13 p.m., then Hill had more time to fabricate what to say to Johnson. We are unpersuaded by this reasoning. The law does not support it. The amount of time that may pass between the startling event and the excited utterance can vary greatly without affecting whether the statement is admissible. *Kinnerson*, 2020 IL App (4th) 170650, ¶ 32. The key consideration for the exception's time element is " 'whether the statement was made while the excitement of the event predominated.' " *Kinnerson*, 2020 IL App (4th) 170650, ¶ 32 (quoting *Sutton*, 233 Ill. 2d at 107-08)). Even if 15 minutes elapsed between the shooting and the phone call, which is unlikely given Hill's text messages to Swan, the amount of time is not the decisive consideration. Manns had just been murdered in Hill's kitchen, and Hill was running away when he called Johnson. It is not arbitrary or fanciful to deduce the startling circumstances of gunshots in his kitchen and the murder of Manns predominated Hill's thoughts and prompted unreflective statements as he spoke with Johnson.

¶ 56          Defendant layers into his timing argument his belief that Hill's statements to Johnson were self-interested, alleging he had a motive to incriminate defendant and deflect police interest in him. Defendant points to Hill's text messages to Swan encouraging him to rob Manns. Defendant insinuates Hill may have planned the crime or even been the shooter. However, the trial court knew about the texts and presumably considered them as part of its totality-of-the-circumstances analysis under the excited utterance exception. Defendant's theory requires us to conclude Hill is either a master criminal, capable of planning his breathless

- 21 -

telephone call immediately after the shooting thereby making it admissible as an excited utterance, or an extremely quick thinker, dreaming up his plan on the run. We will not second-guess the court's conclusions because they are not arbitrary, fanciful, or unreasonable. See *Burney*, 2011 IL App (4th) 100343, ¶ 40.

¶ 57 To convince us the totality of the circumstances indicates Hill's statements were inadmissible, defendant asserts that Hill's statements were responses to questions from Johnson. However, we have previously found "[t]hat a statement *** made in response to an inquiry does not destroy [its] spontaneity." *Burney*, 2011 IL App (4th) 100343, ¶ 39. A declarant's statement being an answer to a question does not mean it cannot also be an exited utterance. This is even more the case when the question is so open-ended as, "[W]hat was he breathing so hard for?." Overall, we are unpersuaded by defendant's sprawling argument. The evidence supports the trial court's decision to admit Hill's hearsay statements under the excited utterance exception. The decision was not arbitrary, fanciful, or unreasonable, so we cannot agree the court abused its discretion. See *Kinnerson*, 2020 IL App (4th) 170650, ¶ 33. We observe defendant devoted much of his argument on this point to a harmless error analysis. Because we find no error, we need not engage his claims.

¶ 58 C. No Violation of Defendant's Sixth Amendment Right to Confrontation

¶ 59 Finally, defendant challenges the trial court's decision to admit Hill's excited utterances based on his constitutional right to confront all witnesses against him. He contends, "Hill's hearsay statement to Johnson was testimonial, and there was not a sufficient showing by the State that he was unavailable, and the defense had no prior chance of cross-examination." Because Hill's statement was not testimonial, defendant's argument fails.

¶ 60          "The confrontation clause in the sixth amendment to the United States Constitution provides that '[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him.' " *Burney*, 2011 IL App (4th) 100343, ¶ 45 (quoting U.S. Const., amend. VI). The sixth amendment applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). *Burney*, 2011 IL App (4th) 100343, ¶ 45. The United States Supreme Court has "held the confrontation clause bars out-of-court testimonial statements unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant." *Burney*, 2011 IL App (4th) 100343, ¶ 46 (citing *Crawford*, 541 U.S. at 68-69).

¶ 61          While the *Crawford* court did not define "testimonial," it observed the term " 'applie[d] at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.' " *People v. Cleary*, 2013 IL App (3d) 110610, ¶ 42 (quoting *Crawford*, 541 U.S. at 68). The Supreme Court later directed courts considering "whether a statement is testimonial" to look to the statement's "primary purpose." (Internal quotation marks omitted.) *Cleary*, 2013 IL App (3d) 110610, ¶ 43. Heeding this guidance, our supreme court previously "held that a testimonial statement is one which is (1) made in a solemn fashion, and (2) *** intended to establish a particular fact." *Sutton*, 233 Ill. 2d at 111. "A statement is made in a solemn fashion if it is formal (such as under oath or made to a police officer) or if there is some threat of consequences for dishonesty." *Cleary*, 2013 IL App (3d) 110610, ¶ 56. We gauge a declarant's intent to establish a particular fact by considering "whether the objective circumstances would lead a reasonable person to conclude that his statements could be used against the defendant." *Sutton*, 233 Ill. 2d at 111.

¶ 62 Defendant's confrontation clause argument centers on Hill's excited utterances to Johnson over the phone. As we outlined above, Hill called Johnson as he fled his apartment. When Johnson asked Hill, "[W]hat [are you] breathing so hard for?" he answered, "I'm running down the alley." And when Johnson asked Hill why he was running, he said, "I let *** J in the house and I walked to the front room. Once I walked to the front room I heard gunshots so I took off running out the front room." Defendant maintains these statements are testimonial. We disagree. First, there is no solemnity here. This is a phone call Hill made to a friend while running from a bad situation. Johnson asked obvious questions any person might ask if he answered the phone and heard his friend breathing heavily. Hill's responses are direct answers to those questions. Hill was not under oath or talking to law enforcement, and he faced no consequences for dishonesty. See *Cleary*, 2013 IL App (3d) 110610, ¶ 56. These circumstances, therefore, contain no indicia of solemnity. See *Cleary*, 2013 IL App (3d) 110610, ¶ 47. Second, we cannot find these objective circumstances would lead a reasonable person to conclude Hill intended or even knew these statements would be used against defendant in a criminal prosecution. See *Sutton*, 233 Ill. 2d at 111. As we said *supra*, ¶ 56, to do so would give Hill too much credit as a criminal savant. Because Hill's statements were not testimonial, defendant had no sixth amendment right to confront him. *Burney*, 2011 IL App (4th) 100343, ¶ 47. Accordingly, no error occurred here.

¶ 63                                    III. CONCLUSION

¶ 64         For the reasons stated, we affirm the trial court's judgment.

¶ 65         Affirmed.